# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **VINCENT W. PEMPEIT, III** | * | **CIVIL ACTION NO. 05-0760** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Vincent W. Pempeit, III, born October 3, 1970, filed applications for disability insurance benefits and supplemental security income on January 28, 2002, alleging disability as of October 15, 1999, due to decompression sickness.[1] After a denial decision issued by Administrative Law Judge W. Thomas Bundy on January 2, 2004, claimant filed a request for review. By Order dated April 7, 2004, the Appeals Council remanded this case for further evaluation of claimant's subjective complaints, mental impairments, maximum residual functional capacity, and the receipt of vocational expert testimony.

---

[1]Claimant filed a previous application for disability insurance benefits on June 2, 2000, in which he was granted a closed period of disability from October 15, 1999 to October 15, 2000. This decision was not appealed.

After a supplemental hearing on September 9, 2004, ALJ Lawrence T. Ragona issued a decision denying claimant's applications. Following denial of review by the Appeals Council, claimant sought judicial review with this Court.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[2]

**(1) Report from Healthsouth dated October 6, 2000**. Claimant complained of pain and weakness in his arms following a series of commercial dives between September 9 and 15, 1999. (Tr. 136). The impression at that time was decompression sickness and ulnar neuropathy. (Tr. 139). On October 6, 2000, Dr. John P. Simanonok found a very subtle weakness of the right biceps and triceps with decreased sensation. (Tr. 140). He opined that claimant probably had a residual

---

[2]Although all of the medical records were reviewed by the undersigned, only those relating to the current applications for benefits are summarized herein.

neurological deficit from his decompression sickness, and recommended that claimant be disqualified from further diving.

**(2) Report from Dr. Michael Berard, Ph.D., dated September 25-29, 2000**. In September, 2000, Dr. Berard diagnosed claimant with adult adjustment disorder with mixed anxiety and depressed mood, and pain disorder associated with psychological factors and general medical condition. (Tr. 199). He recommended continued outpatient psychological consultations and modification of psychotrophic medications.

**(3) Psychological Report from Dr. Alfred E. Buxton dated February 6, 2001**. Claimant reported that he had been seeing Dr. Berard for the past four months on a biweekly basis, and was getting better. (Tr. 201). He was taking Neurontin, Naprosyn, and Wellbutrin. His sleep was restless and disturbed with frequent awakening due to his arm difficulties. His appetite was good, energy was poor, and libido was fair. He had good contact socially. He was able to occasionally cook and clean, and shop, manage money, travel, communicate, and manage time independently.

On examination, claimant's verbal receptive and expressive language skills, as well as dress and groom and social skill, were good. Recent and remote memories were intact. His ability to attend and concentrate were good. Pace was even.

Intellect appeared to be within normative limits. Judgment, reasoning, insight, and reflective cognition were good. Cognitions were clear and cogent. Mood was even.

Self-image and goal orientation were positive. (Tr. 202). Claimant noted that he was more easily upset, and then attempted to escape or avoid the stressor. He had despondency when reflecting on his life situation. He was alert, responsive, and oriented in all four spheres.

Dr. Buxton concluded that claimant's intellect and adaptive daily living skills were within normative limits. Clinically, he presented with chronic pain, with degree of impairment moderate and prognosis guarded; major depressive disorder, single episode, without psychotic features, with degree of impairment mild to moderate and prognosis fair, and insomnia, with degree of impairment mild to moderate and prognosis fair. He recommended continued outpatient psychiatric intervention services and therapeutic services from his psychologist. He commented that treatment might prove to be long-term as opposed to brief.

Dr. Buxton stated that claimant's Global Assessment of Functioning ("G.A.F.") score was 60 over the previous 12 months. He opined that if, and when, claimant showed significant improvement in his overall functional status, as demonstrated through feedback from claimant's treating physicians and interventionists, then referral to Louisiana Rehabilitation Service for assessment, training, and job

placement would be appropriate. He noted that any such referral prior to claimant's demonstrating such significant, lasting, positive improvement would be premature.

**(4) Reports from Dr. Michael Berard dated October 4, 2000 to October 16, 2003**. Dr. Berard treated claimant for symptoms and behaviors consistent with an adjustment disorder with anxiety and depressed mood. (Tr. 226). On December 6, 2000, he noted that claimant had improved from a psychological standpoint. (Tr. 224). He was taking Naproxen, Neurontin, and Wellbutrin.

On March 20, 2001, Dr. Berard opined that, based on claimant's goals and commensurate with his intellectual functioning, he could pursue either a vocational technical training program or an undergraduate education at a slow and appropriate pace. (Tr. 233). On April 25, 2001, Dr. Berard stated that claimant seemed to be coping effectively and was not reporting pervasive symptoms of depression or anxiety. (Tr. 232). At his visit on May 23, 2001, claimant described agitation and aggravation associated with physical limitations, but did not report symptoms of anxiety or depression. (Tr. 230).

On August 15, 2001, claimant appeared to be somewhat tense. (Tr. 228). He was somewhat discouraged that he did not meet the ACT criteria for undergraduate studies at UL. Dr. Berard noted that claimant seemed to be coping fairly well, and

maintained a pro-active orientation. Claimant was not reporting pervasive symptoms of depression or anxiety.

On August 13, 2002, claimant continued to cope effectively. (Tr. 347). He had completed summer school classes with a potential 3.5 grade point average. He acknowledged increasing pain and discomfort with writing, which required additional time to complete tasks. He was not reporting pervasive psychiatric symptomatology.

On March 31, 2003, claimant continued to cope effectively. (Tr. 587). He was aware of his limitations, and had made appropriate adjustments. He remained concerned about being able to secure an employment setting that would not compromise his neurological impairment. He remained as physically active as tolerated, but acknowledged that all of his time was spent on academic studies.

On October 16, 2003, Dr. Berard reported that claimant continued to experience depressive symptomatology, as well as transient symptoms of agitation and aggravation associated with limitations and an unresolved chronic pain component. (Tr. 594). He agreed with the diagnoses rendered by Dr. Buxton. Dr. Berard opined that claimant was experiencing symptoms and behaviors consistent with major depressive disorder, single episode, without psychotic features, and pain disorder associated with both psychological factors and general medical condition. He noted that "[a]s a result of the neurological and psychiatric condition, it would be

unrealistic to expect that [claimant] could be effective and proficient while complying with traditional employment standards of working 8 hours a day, 5 days per week." (Tr. 595).

Dr. Berard noted that claimant had experienced "slight regression" at his appointment on October 16, 2003. He continued claimant's outpatient psychological treatment. (Tr. 596). He opined that "with the ongoing support as above recommended [from the state vocational rehabilitation program, Social Security Administration, and claimant's professors], it is expected that within three to four years, [claimant] will be employed with appropriate benefits to provide for himself, his family, and to contribute to society."

**(5) Report from Dr. Leo A. deAlvare dated July 31, 2001 to July 8, 2003**.
On July 31, 2001, claimant complained of numbness and pain in his upper extremities and memory problems. (Tr. 544). On examination, claimant had good motor power in the upper extremities, but had about ½ grade of weakness in the right biceps and triceps. (Tr. 547). He had decreased pinprick over the last two digits of his right hand, and a small patch of sensory loss in the right forearm. He had bilateral Tinel's signs at the wrists and elbow. Dr. deAlvare's impression was a central cord lesion at C5 or C6, most likely due to decompression illness.

On September 5, 2001, claimant reported that writing at school caused increased pain and discomfort in his right upper extremity. (Tr. 542). He stated that when his arm was in pain, he got tremor of his right upper extremity. Dr. deAlvare told claimant to increase his Neurontin. He refilled his prescription for Ultram.

On February 6, 2002, claimant seemed to be doing "fairly well." (Tr. 538). He still had a lot of complaints with his right upper extremity, but Dr. deAlvare told him "this is the way things are going to be." He increased claimant's dosage of Remeron for sleep, and continued his medication regimen of Neurontin and Wellbutrin.

On May 15, 2002, claimant complained of increasing pain in his right arm, which Dr. deAlvare thought was related to increased use with final examinations. (Tr. 533). He changed claimant's medications from Celebrex to Betra. He continued the Remeron and Wellbutrin, which he thought were working well, and the Neurontin.

On August 14, 2002, claimant was doing fairly well, but was having increased pain in his hand. (Tr. 346). He reported that he had to do a lot of writing in chemistry class, which caused a lot of tremor in his upper extremity. Dr. deAlvare stated that claimant appeared to be doing well from an emotional standpoint, but still was still having a lot of motor problems with the right upper extremity. He added Inderal to claimant's medical regimen.

On November 13, 2002, claimant stated that his tremor was better on Inderal, but his blood pressure was still elevated at 140/90. (Tr. 592). He stated that he had pain with writing for a prolonged period of time. His professors had given him extra time to do his work. Dr. deAlvare increased his Inderal.

On July 8, 2003, claimant still had a lot of discomfort with the right upper extremity, particularly with physical activity. (Tr. 591). He was sleeping better, and his depression had improved after his final exams. Dr. deAlvare continued his medications of Neurontin, Inderal, Remeron, Bextra, Ultram, and Wellbutrin.

**(6) Consultative Physical Examination by Dr. Harold A. Heitkamp dated June 26, 2002**. Claimant complained of pain in his right arm and shoulder, decreased feeling in his forearm, and numbness in the fingers of the right hand. (Tr. 457). On examination, he was 6 feet tall and weighed 300 pounds. (Tr. 458). His blood pressure was 128/78. He walked with a normal gait.

Claimant stated that he could not use his right arm for any length of time, because it would become very tired. (Tr. 459). He had good strength in the shoulders, biceps, and triceps. He had slight atrophy in the right upper arm; wrists were within normal limits. He had a good left hand grip and grasp, some weakness in the right grip and grasp, and normal dexterity. He had normal sensation to pin prick on the left, but decreased sensation on the right below the elbow, right arm and

hand in a stocking glove pattern.

On lumbar examination, claimant could squat fully, get up on his toes and take a step, and rock back on his heels. He had full range of motion, no spasm, and no tenderness. His reflexes were 2+ in the biceps, and 4+ in the patella and achilles.

Straight leg raising tests were negative. Claimant's hips were within normal limits, with full range of motion. The knees had full range of motion, with no effusion or ligamentous weakness. He had some slight grating in both knees. The ankles had normal flexion and sensation. There was no atrophy of the lower extremities.

Dr. Hetikamp's impression was Type 2 decompression syndrome, decreased sensation in the forearm, particularly in the median and ulnar nerve, and mild atrophy of the right upper arm; rule out early condromalacia of the knees; post-surgery for sleep apnea, and mental depression under treatment.

Claimant stated that he could use his right arm for 10 minutes, then would start getting pain and shaking. (Tr. 459-60). Dr. Heitkamp opined that claimant would never get back to doing deep sea diving. (Tr. 460). He noted that the only pathology on physical examination was the right forearm, which had some slight weakness and decreased sensation. He stated that claimant could do some work not including the

right arm. He observed that claimant was in retraining and was studying to be a pharmacist.

**(7) Residual Functional Capacity Assessment ("RFC") dated July 8, 2002**. Claimant was found to have no exertional or postural limitations. (Tr. 506-07). He was limited as to fingering, due to slight weakness in the right hand and decreased sensation. (Tr. 508). It was noted that he played on the computer most of the day and attended college as a pharmacist student. (Tr. 510). His statements regarding his right arm limitations were found to be a bit disproportionate with the objective medical findings.

**(8) Psychiatric Review Technique dated July 11, 2002**. Dr. R. H. Rolston noted that even though claimant was under a doctor's care for treatment of depression, his condition was considered to be not severe. (Tr. 525). He observed that claimant attended college and was taking courses in pharmacology. He opined that even though claimant experienced depression, he still maintained the ability to concentrate and maintain an efficient GPA. He stated that claimant's ability to continue to perform daily activities were not affected by his depression. Thus, disability could not be established based on a mental impairment.

**(9) Functional Capacity Evaluation by Manny R. Gala, O.T.R., C.H.T., dated January 10, 2003**. Mr. Gala indicated that claimant would have difficulties

engaging in any occupations that would require prolonged use of the right hand. (Tr. 565). He noted that claimant developed tremors during activities like writing, using the hand in manipulative skills, or dexterity and coordination activities. He also observed that claimant had some atrophy of the right upper extremity musculature on the right side.

Mr. Gala opined that claimant was unable to perform heavy duty work. (Tr. 577). He noted that claimant had difficulties performing medium to light duty work. He observed that claimant had difficulties in writing which would restrict him from performing some sedentary jobs.

**(10) Claimant's Administrative Hearing Testimony**. At the hearing on September 9, 2004, claimant was 33 years old. (Tr. 643). He testified that he was 6 feet tall and weighed 340 pounds. (Tr. 644). He stated that his weight had gone up dramatically since his accident.

Claimant had completed high school. (Tr. 645). He reported that he was attending classes in toxicology at the University of Louisiana at Monroe. He stated that he was taking 12 credits.

Claimant reported that he had transferred from the University of Louisiana at Lafayette that semester. He stated that he had done well at ULL with the accommodations provided, including having other students take notes for him,

allowing him to bring a tape recorder to class, giving him a handicapped parking space, and giving him extended test times or altered test forms. (Tr. 646). He reported that his GPA was just under 3.0.

As to limitations, claimant testified that his ability to type or write ranged from 15 to 20 minutes to two hours depending on his right arm pain. (Tr. 646-47). He reported that he had to stop walking and sit down if his arm was hurting. (Tr. 647). He said that he could lift 20 to 25 pounds with his right hand, but could not do anything after 30 minutes to an hour because of pain which radiated from his fingers to the back of his shoulder. He stated that he had to take breaks for at least a couple of hours. (Tr. 648).

Regarding medications, claimant testified that he took Wellbutrin, Neurontin, Bextra, Inderal, and Remeron. (Tr. 649). He stated that he was taking medications for pain and depression.

As to activities, claimant testified that he could drive for a couple of hours, then had to stop and pull over. (Tr. 644, 649). He stated that he had a roommate who helped him out with cooking and cleaning. (Tr. 649). He reported that he studied all day long. (Tr. 653).

Claimant reported that he had past work experience as a commercial diver. (Tr. 650). He stated that he had suffered from decompression sickness on the job. He

testified that he had received a settlement of $600,000. (Tr. 651).

Additionally, claimant had worked as a radioman in the Navy. He had also operated a cash register at Dairy Queen. (Tr. 652).

Claimant testified that his right hand was the main thing that interfered with his ability to work. (Tr. 652). He also reported that he did not sleep at night sometimes because of pain. (Tr. 652-53).

**(11) Administrative Hearing Testimony of Claimant's Wife, Vicky Pompeit**. Claimant's wife testified that claimant was often very moody and depressed when he was at home. (Tr. 658). She reported that his arm started to shake after he did chores, such as mowing the grass. She stated that he was able to help with grocery shopping, but she had to get the groceries and put them up. She said that he did limited repair work, like changing light fixtures. (Tr. 659).

Mrs. Pompeit reported that claimant's condition varied. She said that he got along all right with her and the neighbors.

**(12) Administrative Hearing Testimony of Lester Soileau, Vocational Expert ("VE")**. Mr. Soileau classified claimant's past work as a hardhat diver as skilled and heavy, a diver tender as semiskilled and medium, a radio officer as skilled and sedentary, and a fast food worker as unskilled and light. (Tr. 662). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age,

education, and work experience; who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit for 6 hours in an 8-hour day; could not do prolonged activities with his right hand, such as constant writing beyond one-half hour at a time; could not do repetitive fine manipulation, and required a job with limited interaction with the general public because of emotional problems. (Tr. 662-63). In response, the VE identified the jobs of garment folder, of which there were 701,000 light jobs nationally and 10,000 statewide; surveillance system monitor, of which there 6,000 sedentary jobs nationally and 6,100 statewide, and fire and police dispatcher, of which there were 2500 sedentary jobs nationally and 47 statewide. (Tr. 663). Mr. Soileau also identified a job which had some public contact, which was taxi cab radio operator, of which there were 32,000 sedentary jobs nationally and 545 statewide. (Tr. 664).

When the ALJ modified the hypothetical to include the limitation that claimant had to lie down for a protracted period of time, Mr. Soileau testified that that would not be competitive full-time employment. Additionally, when the ALJ added an episodic situation where claimant's pain some days was such that he could not follow even one- or two-step instructions four or five times a month, the VE opined that he could not do any jobs on a sustained basis. (Tr. 665).

Claimant's attorney asked Mr. Soileau to consider a hypothetical in which claimant suffered from a major depressive disorder, chronic pain from both a psychological and general medical condition, transient symptoms of agitation and aggravation, recently engaging in catastrophic thinking, visible tremors in the right hand from any activity from a short period of time, and weakness and numbness in the right hand such that he had difficulty writing. (Tr. 665-666). In response, the VE testified that such limitations would reduce the number of jobs to less than what he had indicated. (Tr. 666). When the representative asked whether claimant would have difficulty sustaining employment with these additional limitations, Mr. Soileau indicated that he would if he had to be absent during the workday. (Tr. 666-67).

**(13) The ALJ's Findings are Entitled to Deference**. Claimant argues: (1) the ALJ erred in failing to consider the combined effect of his impairments; (2) the ALJ erred in failing to consider non-exertional impairments, including claimant's pain and depression, in finding that there were a significant number of jobs in the national economy that he could perform, and (3) the ALJ erred in failing to consider whether claimant's combination of physical and mental impairments would permit him to maintain employment. Because I find that the ALJ erred in finding that claimant had the ability to maintain employment, I recommend that the Commissioner's decision be **REVERSED,** and that the claimant be awarded benefits.

In evaluating the medical evidence, the ALJ considered Dr. Buxton's opinion recommending vocational rehabilitation "[a]s the claimant's functional status improved." (Tr. 19). However, what Dr. Buxton **actually** found was that claimant should not be referred for assessment, training and job placement unless and until "he showed *significant improvement* in his overall functional status, as demonstrated through feedback from his treating professionals and interventionists." (emphasis added). (Tr. 439). There is no indication in the record that any such improvement, in fact, occurred; the ALJ never found any such improvement. Dr. Buxton further stated that "[a]ny such referral prior to him demonstrating such *significant lasting positive improvement* would be premature." (emphasis added). Again, no evidence of any such "lasting positive improvement" is cited by the ALJ and my review of the medical record fails to disclose any.

The record reflects that claimant has been treated by psychologist Michael Berard since September, 2000. (Tr. 462-504, 563, 587-90, 594-96). During that time, claimant saw Dr. Berard on a regular basis and was treated with psychotropic medications. In Dr. Berard's last report dated October 16, 2003, he noted slight regression. (Tr. 595). He found that claimant was still experiencing depressive symptomatology, as well as transient symptoms of agitation and aggravation associated with limitations and an unresolved chronic pain component. (Tr. 594). He

opined that "[a]s a result of the neurological and psychiatric condition, it would be unrealistic to expect that [claimant] could be effective and proficient while complying with traditional employment standards of working 8 hours a day, 5 days per week." (Tr. 595). The ALJ points to nothing in the medical records that contradict that opinion.

The record further reflects that claimant is still having difficulties with his right hand. In the Functional Capacity Evaluation prepared in January, 2003, Manny Gala indicated that claimant would have difficulties engaging in any occupation that would require prolonged use of the right hand. (Tr. 565). He noted that even during routine activities like writing, claimant developed tremors, pain, and numbness which persisted after 30 minutes of break. Mr. Gala further observed that it took claimant almost an hour and a half to write three pages with his right hand. He opined that claimant's difficulties in writing would restrict him from performing some sedentary jobs. (Tr. 577).

In his decision, the ALJ failed to consider the opinion of claimant's treating physician, Dr. Berard, regarding claimant's inability to work on a sustained basis. The expert opinion of a treating physician as to the existence of a disability is binding on the fact-finder "*unless contradicted by substantial evidence to the contrary.*" (emphasis added). *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (quoting *Bastien*

*v. Califano,* 572 F.2d 908, 912 (2d Cir.1978)); *see also* 20 C.F.R. § 404.1527(d)(2). Here, the ALJ has cited no substantial evidence to contradict Dr. Berard's finding, and a full review of this record by the undersigned fails to disclose any such substantial evidence. The same is true for the findings and opinions of Dr.Buxton which support the opinion of Dr. Berard.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job he finds for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (citing *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)). According to the sources who personally evaluated him, claimant would be unable to maintain gainful employment. Thus, the ALJ erred in his determination that claimant retains the capacity for work on a sustained basis.

Because the ALJ erred in finding that claimant had the ability to maintain employment, the undersigned recommends that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits. The undersigned recommends that January 28, 2002, which is also the date of the filing of the application, be used as the onset date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b),

parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Lafayette, Louisiana, February 10, 2006.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id*. at 619.

Here, claimant has not demonstrated that her symptoms were of sufficient frequency or severity to prevent her from holding a job for a significant period of time during the relevant period as required by *Watson*. As noted by the ALJ, the objective evidence does not support the severity of the complaints alleged by claimant. (Tr. 15-16). Thus, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be AFFIRMED and that this action be DISMISSED with prejudice.

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **VINCENT W. PEMPEIT, III** | \* | **CIVIL ACTION NO. 05-0760** |
| **VERSUS** | \* | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL** | \* | **MAGISTRATE JUDGE HILL** |
| **SECURITY** | | |

## JUDGMENT

This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. After an independent review of the record, including the objections filed herein, this Court concludes that the Report and Recommendation of the Magistrate Judge is correct and adopts the findings and conclusions therein as its own.

Accordingly, IT IS ORDERED, ADJUDGED AND DECREED that the Commissioner's decision be REVERSED, and the claimant be awarded appropriate benefits commencing January 28, 2002.

Lafayette, Louisiana, this ___ day of _____, 2006.

_____

TUCKER L. MELANÇON

UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **VINCENT W. PEMPEIT, III** | * | **CIVIL ACTION NO. 05-0760** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## JUDGMENT

This matter was referred to United States Magistrate Judge C. Michael Hill for Report and Recommendation. No objections have been filed. The Court concludes that the Report and Recommendation of the magistrate judge is correct and therefore adopts the conclusions set forth therein.

Accordingly, IT IS ORDERED, ADJUDGED AND DECREED that the Commissioner's decision be REVERSED, and the claimant be awarded appropriate benefits commencing January 28, 2002.

Lafayette, Louisiana, this ___ day of _____, 2006.


_____
TUCKER L. MELANÇON

UNITED STATES DISTRICT JUDGE